UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

LORI BURRIS,

                    Plaintiff,

          v.

FRITO-LAY, INC.,

                    Defendant.

Case No. C09-5492RJB

ORDER ON
DEFENDANT'S MOTION
FOR SUMMARY
JUDGMENT

This matter comes before the court on Defendant's Motion for Summary Judgment and

Memorandum in Support.  Dkt. 22.  The court has considered the pleadings filed in support of and in

opposition to the motion and the file herein.

PROCEDURAL HISTORY

On August 10, 2009, this case was removed from Clark County Superior Court, on the basis of

diversity jurisdiction under 28 U.S.C. § 1332.  Dkt. 1.  The First Amended Complaint alleges that

"defendants discriminated against plaintiff because of her gender/sex by subjecting her to a sexually

hostile and abusive work environment that interfered with and restricted her ability to perform her work."

Dkt. 1, at 9.  The First Amended Complaint apparently alleges claims under chapter 49.60, RCW, the

Washington Law Against Discrimination (WLAD).

MOTION FOR SUMMARY JUDGMENT

On May 11, 2009, defendant filed a motion for summary judgment, contending that (1) the

conduct of Mr. Pratt, although unwelcome, was not motivated by animus toward women;(2) the conduct

ORDER
Page - 1

1  was not objectively severe or pervasive and did not alter the conditions of plaintiff's employment; and (3)

2  defendant took reasonable care to prevent and to promptly correct the alleged harassment.  Dkt. 22.

3       On May 31, 2010, plaintiff filed a response, contending that there are issues of fact on the

4  following issues: (1) Mr. Pratt harassed plaintiff because of her gender; and (2) defendant knew the Mr.

5  Pratt was harassing female employees because of their gender for a long time, but did not stop him until

6  plaintiff and another female employee formally complained. Dkt. 24.  Contrary to defendant's assertion in

7  its reply, the response was timely.  *See* Local Rule CR 7(d)(3).

8       On June 4, 2010, defendant filed a reply, arguing that plaintiff and her co-workers feelings,

9  suspicions, or fears, in the absence of verbal conduct or physical contact, are insufficient to constitute

10  harassment or discrimination on the basis of gender; men, not just women, thought of Mr. Pratt as odd,

11  strange, creepy, or socially awkward; and defendant responded appropriately when management became

12  aware of plaintiff's complaints.  Dkt. 26.

13  RELEVANT FACTS

14       Since 1996, plaintiff worked, and continues to work, as a packer at defendant Frito-Lay's

15  processing plant in Vancouver, Washington.  James Pratt worked as a porter in the sanitation department

16  at the plant for approximately 32 years before retiring in June 2008.  Mr. Pratt's duties included cleaning

17  the male and female restrooms, the lunchroom, the hallway, and other areas, on the graveyard shift.

18  Plaintiff and Mr. Pratt did not work in the same department, but they worked both worked the

19  third/graveyard shift.

20       Defendant has policies regarding violence, harassment, and discrimination in the workplace;

21  employees, including plaintiff, received these policies and attended annual training regarding the policies

22  and reporting procedures.  Dkt. 23, at 9, 27-34.  During her deposition, plaintiff testified that it was the

23  company's policy "[t]o bring it to the attention of your supervisors."  Dkt. 23, at 9.

24  **1. Incidents before March 5, 2008**

25       Bill Paradee, who had worked at the Vancouver plant for 16 years, told HR Manager Ron Britt,

26  during a company investigation of Ms. Burris' complaint about Jimmy Pratt's behavior, that concerns

27  about Mr. Pratt had been expressed to him "within the last couple years."  Dkt. 25, at 5.  Mr. Paradee

28  stated that he had heard different comments from employees concerning Mr. Pratt's behavior as

1  "strange", and even referring to Mr. Pratt as a "pervert." Dkt. 25, at 5. Mr. Paradee stated that, about two

2  years ago, he had received a complaint from Carrie Hopkins and Heidi Overby that Mr. Pratt "had rubbed

3  his groin against a picnic table they were sitting at." Dkt. 25, at 5. Mr. Paradee had conducted an

4  investigation about this incident. Mr. Pratt told Mr. Paradee that "he did not realize he had rubbed his

5  groin on the table, however perhaps it was perceived that way when he reached across the table." Dkt.

6  25, at 5. Mr. Paradee stated that there were "no witnesses" to this incident and that Ms. Hopkins had

7  received informal coaching on a comment she had made, and this could impact her credibility. Dkt. 25, at

8  5. Mr. Paradee also stated that he had heard of some concerns regarding Mr. Pratt "'crowding' others

9  (standing too close to them and/or cleaning directly around where the employee is sitting or standing).

10  Bill [Mr. Paradee] does not recall if those complaints were from women or men." Dkt. 25, at 5.

11      During Mr. Britt's investigation, Lauri Rosu stated that nine years before the March of 2008

12  incidents with plaintiff, she felt a breath at the back of her neck and turned around to see Mr. Pratt

13  standing very close behind her. Dkt. 25, at 6. Ms. Rosu asked Mr. Pratt what he was doing. Dkt. 25, at

14  6. "Jim did not say anything but just smiled and walked away." Dkt. 25, at 6. Ms. Rosu told Mr. Britt

15  that, a couple of months later, she again felt breath on the back of her neck. "At that time she hit Jim as

16  hard as she could with her elbow in the stomach and told him 'get out of here.'" Dkt. 25, at 6.

17      As part of Mr. Britt's investigation, Patti Ozier was interviewed. Dkt. 25, at 7. Ms. Ozier told Mr.

18  Britt that Mr. Pratt has purposely bumped into her "or otherwise purposely has gone out of his way to get

19  next to her on many occasions." Dkt. 25, at 7. Ms. Ozier stated that she has seen Mr. Pratt purposely

20  bump into or move next to other women. Dkt. 25, at 7. Ms. Ozier also stated:

21      Patti stated on one occasion approximately a couple months ago she came out of the front
        bathroom (the ones without any doors) during her break and Jim was standing in the entrance
22      seeming to be listening in. He immediately walked away when she saw him. She does not believe
        Jim was intending to clean the restrooms since he does that at 1:00 and 4:00 and she takes her
23      breaks at 12:00 and 3:00 (and because he walked away when she saw him). Patti believes Jim was
        simply trying to listen to her pee. She did not report the incident to her Resource. She now avoids
24      using those restrooms, and instead uses the ones down by the Traffic lunch area because she
        knows Jim does not clean those (and those have a door).

25
    Dkt. 25, at 7.
26
        In her deposition, plaintiff testified that "I had brought to the attention of supervisors, casually,
27
    not–no paperwork involved, that I was bothered by the behavior of Jimmy Pratt over the years. I went to
28
    HR casually once over Jimmy Pratt, Jimmy Pratt's behavior around–around his duties of cleaning the

ORDER
Page - 3

1  bathroom, his behaviors and..." Dkt. 23, at 10.  Plaintiff testified that she talked with several "resource"

2  individuals about Mr. Pratt.  She testified that, in late Winter of 2007 or early Spring of 2008, she had a

3  conversation with Tarek Dahimi about her concerns about Mr. Pratt's behavior and plaintiff's ways of

4  avoiding Mr. Pratt.  Dkt. 23, at 10.  Plaintiff stated that she told Mr. Dahimi that there were "some issues

5  around his behaviors cleaning the bathroom that made it inconvenient not only for me but the women in

6  the plant–not the fact that he was cleaning the bathroom, but his behaviors during that process." Dkt. 23,

7  at 10.  "[T]hat he's hanging around, and, you know, making up his own schedule to do what he

8  wants–you know, depending on who's in the bathroom or who wants to use the bathroom or..."  Dkt. 23,

9  at 10.  Plaintiff testified that she had had conversations with Jamie Henderson in 2007 ["'the guy drives

10  me crazy.'  Yeah.  'He stalks me.'" (Dkt. 23, at 11)]; and Luis Fernandez and Ray Weeth from 2006 to

11  2007 ["Jimmy Pratt shuffles his feet quite loudly and where he shuffled up behind me, you know, in

12  reference to our prior conversation about Jimmy Pratt's behaviors." (Dkt. 23, at 11)].

13      Plaintiff further testified as follows:

14      Q.  But I want to know specifically, what was it about him that you were avoiding?  What–When
        you described his behaviors, I want to–I need to know what they were.

15
        A.  Okay.  Wherever I seemed to go, wherever I went, he seemed to be right there, wanting to be
16      very, very close to me, breathing down–sneaking up behind me and breathing down the back of
        my neck, making himself present way too many times to be coincidental.  At first I thought
17      possibly it was a coincidence, and then I started paying more attention.  During–if I was in the QA
        lab, there had been a few incidents where he would sneak in–I'm in there by myself, he would
18      come in very quietly and I wouldn't know he was there until I felt his breath on my neck.  I would
        be in the pick and trim room, which is an isolated–just I'm the only one up there, and he would
19      make a point of being up there three times a night to check on the status of the paper towels.  I
        knew that he was choreographing his duties to coincide with my locations; and due to his ability to
20      study the schedule, he–he did pretty well on being where I was going to be, and so I tried to
        choreograph my life to avoid him–
21
    Dkt. 23, at 12.
22
        Plaintiff stated that she told Mr. Pratt "to get the **** away from me, many times."  Dkt. 23, at
23
    12.  Plaintiff also stated that she did not expect anything from the people she had talked to about Mr.
24
    Pratt's behavior.  "To be honest with you, no, I never expected anything."  Dkt. 23, at 12.  "That's kind of
25
    the vibe out there. You're pretty much on your own."  Dkt. 23, at 12.
26
        **2. March 5, 2008 Incident**
27
        On the morning of March 5, 2008, toward the end of her shift, plaintiff described the following
28
    incident:

ORDER
Page - 4

1
2
3
4

About half — halfway down the plant, off of the maintenance hallway, I was in the packaging area, doing some cleaning. I was extra that night and I had a real full schedule. I was cleaning, I want - and I was waiting for another department to go down, our seasoning to go down, to do more cleaning. I needed to use the restroom, urgently. I came out of packaging, crossed through the kitchen area into the maintenance hall towards the PC lab area. I saw him coming the opposite direction towards the PC lab area and thought, "I have to go to the bathroom but I'm going to hurry," so - - because I figured he was going to pull something odd.

5
6
7

So I shot into the PC lab area. A co-worker of mine works in that lab. It's a glass front. I knocked on the window and did her like that. I ran into the bathroom, literally, and urinated as quickly as I could and flushed the toilet and came out and washed my hands, came out of the bathroom. And he was right there, just right at the door.

8

Dkt. 23, at 13-14.

9
10
11
12
13
14
15
16
17

As she was leaving the bathroom, plaintiff stated during an internal investigation that she saw Mr. Pratt heading in her direction and moved out of the way before they collided. Dkt. 23, at 35.  Plaintiff also stated that Joan Sauls asked to speak to plaintiff in private, at the end of the shift. Dkt. 23, at 35. According to the statement plaintiff gave to HR manager Ron Zito, Ms. Saul told plaintiff "that she had witnessed Mr. Pratt standing outside the women's bathroom while she was using it.  She told Ms. Burris that Mr. Pratt appeared to put his head near the door, as if to listen if someone was in the bathroom or not. Ms. Sauls explained that he went on to open the bathroom door and lean into the entrance way of women's restroom." Dkt. 23, at 35. There is no evidence that Mr. Pratt entered the bathroom; Mr. Pratt denied that he entered the bathroom.  Dkt. 23, at 37.

18
19
20
21
22

After the incident with Mr. Pratt, plaintiff went back to work.  Dkt. 23, at 14. After her shift, plaintiff started to go home, but then decided that she "wasn't going to take it this time; it had gone far enough" and went back in and reported the incident. Dkt. 23, at 14. Plaintiff reported the incident to Mr. Pratt's immediate supervisor, Tim Meyer, the Sanitation Manager, who in turn confronted Mr. Pratt with plaintiff's allegations. Dkt. 23, at 15.

23
24
25

By the next morning, the Human Resources Managers, Ron Britt and Ron Zito, met with plaintiff, Ms. Sauls and union steward Joe Crane.  Dkt. 23, at 15. Mr. Britt and Mr. Zito took plaintiff's statement and Ms. Sauls' statement. Dkt. 23, at 15. At this point, plaintiff informed Mr. Zito of the following:

26
27

I told him that there had been a long history of this guy basically stalking me, and not just me, the–I'm not the only one; I believe I was his favorite–and that he had had a long history of bizarre behaviors in the plant. He'd been there quite a number of years, 30 years or something.

Dkt. 23, at 16.

28

Mr. Meyer testified in a deposition that, before the incidents regarding Ms. Burris, he had not

ORDER
Page - 5

1  heard anything directly about Mr. Pratt making other employees uncomfortable.  Dkt. 23, at 60.  Mr.

2  Mayer said that Mr. Pratt is "not the most social individual.  He is socially shy, socially awkward in

3  conversation.  He is very quiet."  Dkt. 23, at 60.  Mr. Mayer stated that Mr. Pratt is "very standoffish to

4  other individuals, if you will.  People don't want to interact with him because of that.  And I wouldn't say

5  not only women but also men."  Dkt. 23, at 60.

6          Mr. Zito, Mr. Britt, and Mr. Meyer conducted an investigation. Dkt. 23, at 16 and 59.  Mr. Meyer

7  spoke with Mr. Pratt on March 6, 2008, and instructed him not to clean the women's restroom that night.

8  Dkt. 23, at 61. As part of the investigation, Mr. Meyer asked plaintiff whether there had been any physical

9  contact or any verbal exchange. Dkt. 23, at 59.  Plaintiff told Mr. Mayer that there had not been any. Dkt.

10  23, at 17 and 59.

11          Mr. Zito testified at his deposition that the result of the investigation was "inconclusive."  Dkt. 23,

12  at 71.  On March 7, 2008, Mr. Meyer gave Mr. Pratt a written memorandum entitled "Notice of Action

13  Required." Dkt. 23, at 63.  Mr. Meyer instructed Mr. Pratt to "avoid all potential contact" with either

14  plaintiff or Ms. Sauls.  Dkt. 23, at 63.

15          On March 7, 2008, Mr. Zito informed plaintiff of the company's response to her March 5

16  complaint. Dkt. 23, at 17 and 37. Plaintiff testified at her deposition that she was "really upset" about the

17  company's response.  Dkt. 23, at 17.  Plaintiff testified that she told Mr. Zito that if Mr. Pratt "came

18  anywhere within my personal space, I was coming out swinging, that I would defend myself.  I would

19  assume I was under attack if he came within my personal space." Dkt. 23, at 17.

20          Plaintiff testified that Mr. Zito told her that Mr. Pratt was "strongly counseled", and that, if Mr.

21  Pratt approached her, she should report it immediately to HR.  Dkt. 23, at 16.

22          Plaintiff provided Mr. Zito with the names of other employees who had witnessed Mr. Pratt

23  behaving inappropriately. Dkt. 23, at 75. Mr. Zito informed plaintiff that, based on this new information,

24  they would look into the matter further. Dkt. 23, at 75. As a result, Mr. Zito interviewed each of the

25  individuals identified by plaintiff as part of the investigation. Dkt. 23, at 72.

26      **3.  March 8, 2008 Incident**

27          On March 8, 2008, plaintiff reported another incident involving Mr. Pratt. This incident involved a

28  different women's restroom, which has a locker room incorporated into it, and no real doors; instead, there

1 | are open double doorways for both the north and south entrances. Dkt. 23, at 13.

2 | Plaintiff stated at her deposition that she agreed to take her break, knowing that she was getting

3 | very close to the time that Mr. Pratt cleaned that bathroom.  Dkt. 23, at 18.

4 | A....So I ran to the–what would be the south end of the locker room and checked for his sign, which was not there.  I ran through the locker room and checked for his sign in the front, which
5 | would mean that the bathroom was then off limits, that he was going to come in an clean.

6 | Q. Right.  Right.

7 | A.  And I knew it was close to the time.  But the signs weren't up, and I thought, "Well, maybe I have time to use the bathroom."  So I shot directly into the restroom time—side; and the minute I
8 | got close to the stall, I heard "Any ladies?" and I thought, "Well, that figures," you know, "That's just my luck."  And I said, "Yes.  Go away."  And then I thought, "Well, I'm not going to go to the
9 | bathroom, because I'm too uncomfortable knowing he's out there."  And he prob–I can't imagine what he knew or didn't know, but I would imagine he knew it was probably me in there, because
10 | he watches.

11 | So at that point, I said, "Yes.  Go away."  And I thought, "I'm just going to get my lunch pail and get out of here," you know, "and my book."  And then I panicked and realized, "I'm in here alone.
12 | There's nobody around.  I hear voices in the men's locker room, but they're in the men's locker room and he's out here waiting."
13 |
14 | So I put my back to the wall.  He was waiting here.  The double entry is here.  I came out the one entry, put my back to the wall, came out–you know, came out like this, turned and said, "Jimmy, go down the hall until I'm out of here."  I gave him directions, because I–I felt very vulnerable
15 | being in the locker room alone and him being at the entrance of the locker room.

16 | Instead of going down the hall after he'd been strongly counseled to stay away from me, he turned towards me with his lead–or his metal pipe with the sign hanging on it and proceeded to walk
17 | directly towards me, saying, "But it's time to clean, It's time to clean, It's time to clean," until I was backed against the wall.  He had me blocked from getting out of the locker room, and my only
18 | recourse was to either go into the locker room or fight.

19 | Dkt. 23, at 18-19.

20 | Plaintiff stated in a March 8, 2008, statement that Mr. Pratt crossed in front of her and positioned

21 | himself at the wall that ran from the bathroom to the Cafeteria.  Dkt. 23, at 43-44.  Then, plaintiff stated

22 | that she called out that she needed a resource. Dkt. 23, at 44.

23 | Plaintiff did not mention the metal pipe in her investigation interview with Mr. Zito, or in her

24 | April 25, 2008, statements to the Washington Human Rights Commission.  Dkt. 23, at 74, and 45-55.

25 | Plaintiff testified in her deposition that she could have exited via the south entrance, but she chose not to

26 | use that exit,

27 | because I wanted my book. That was my break time. I wanted my book and I just wanted to get out. So that's when I thought, "Okay. I've got to get my stuff. I don't want to be in here alone."
28 | protected myself, came to the door and said, "Go" — I didn't know if he knew it was me or not; I assumed he did, but I don't know that. I said, "Jimmy, go down the hall until I'm done." I just

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

wanted to get my lunch pail, my book, and go to my break. I would find someplace else to go to the bathroom."

Dkt. 23, at 19.

On March 8, 2008, Mr. Meyer gave Mr. Pratt a second written memorandum, entitled "Notice of Action Required." Dkt. 23, at 64. Mr. Meyer gave Mr. Pratt specific instructions regarding procedures for entering the women's restrooms at cleaning times. Dkt. 23, at 64. As the investigation continued, Mr. Zito interviewed Mr. Pratt, who described the March 8, 2008; Mr. Pratt told Mr. Zito that "he was not combative, nor hostile, he did not lean towards Ms. Burris, and rather she leaned towards him and pointed her finger." Dkt. 23, at 76.

Mr. Pratt was suspended, after plaintiff's second complaint, pending the outcome of the investigation. Dkt. 23, at 20, 21, and 72. Plaintiff testified at her deposition that she spoke with Mr. Zito when she returned to work on Monday about the locker room incident and, that Mr. Zito responded reasonably. Dkt. 23, at 20. Plaintiff stated in her deposition that she was not concerned about returning to work after the March 8, 2008, incident because Mr. Pratt had been suspended before her shift started. Dkt. 23, at 20.

Plaintiff's complaints were investigated by Human Resources and Mr. Meyer, but neither incident was substantiated. Dkt. 23, at 37-40, 60, and 71.

As a result of the incidents and investigations, Mr. Meyer, along with the help of Human Resources personnel, documented plaintiff's complaints and the investigations, and instructed Mr. Pratt to return to work under certain conditions, including specific guidelines for performing cleaning responsibilities. Dkt. 23, at 60, 65-66. Mr. Pratt, Pratt was required to (1) adhere to Frito-Lay's non-harassment policy; (2) not initiate contact with Ms. Burris; (3) not retaliate against any person involved in the investigations; (4) not discuss the matter with his co-workers; and (5) follow the guidelines for cleaning. Dkt. 23, at 65-66. Mr. Meyer communicated the guidelines to Mr. Pratt in person and in a memorandum, and set forth specific details of Pratt's duties: Pratt was required to: 3 (a) knock loudly three times and announce twice who he is and ask if anyone is in the restroom before entering; (b) if someone responds, request that she notify Pratt of when she leaves; (c) if waiting for some to exit the restroom, wait 10 feet from the door or work in the adjacent supply closet; (d) then, when approaching a second time, follow steps beginning at (a) again; (e) use the signs and place the cleaning cart in the

ORDER
Page - 8

1    entrance of the smaller restrooms while cleaning; (f) respect the personal space of co-workers and

2    maintain a distance of 3 feet; and (g) avoid cleaning common areas where an employee is located (clean

3    other general welfare or common areas that are not occupied first, to respect personal space. Dkt. 23, at

4    65-66.

5         The porter's supply closet is located immediately next to the entrance to the women's restrooms

6    at issue—and the guidelines allowed Pratt to work in the supply closet and place his cart outside

7    the closet, with the goal of minimizing any potential for interaction. Dkt. 23, at 65-66, 73.

8    One of the aims of the memorandum and counseling by Mr. Meyer was to: "set ground rules, make

9    sure that Mr. Pratt does understand the nonharassment policy and any policies about * * *

10   retaliation, * * * and to set up some expectations of the porter role." Dkt. 23, at 60.

11        On March 17, 2008, Mr. Zito wrote a memo to plaintiff that an immediate and thorough

12   investigation was conducted.  Dkt. 23, at 38.  The memo stated as follows:

13       We are taking appropriate remedial steps to address your concerns.  Jim has been strongly
         counseled regarding the seriousness of this matter.  We have provided him with detailed
14       guidelines related to the performance of his duties and interactions with co-workers. We have also
         reduced the amount of times he is responsible to clean the women's restroom to once per night.

15   Dkt. 23, at 38.

16                                    SUMMARY JUDGMENT STANDARD

17        Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file,

18   and any affidavits show that there is no genuine issue as to any material fact and that the movant is

19   entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c). The moving party is entitled to judgment as a

20   matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a

21   claim in the case on which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477

22   U.S. 317, 323 (1985).  There is no genuine issue of fact for trial where the record, taken as a whole, could

23   not lead a rational trier of fact to find for the non moving party.  *Matsushita Elec. Indus. Co. v. Zenith*

24   *Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative

25   evidence, not simply "some metaphysical doubt.").  *See also* Fed.R.Civ.P. 56(e).  Conversely, a genuine

26   dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute,

27   requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*,

28   477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d

ORDER
Page - 9

1    626, 630 (9th Cir. 1987).

2        The determination of the existence of a material fact is often a close question.  The court must

3    consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a

4    preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254, *T.W. Elect. Service Inc.*,

5    809 F.2d at 630.  The court must resolve any factual issues of controversy in favor of the nonmoving

6    party only when the facts specifically attested by that party contradict facts specifically attested by the

7    moving party.  The nonmoving party may not merely state that it will discredit the moving party's

8    evidence at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W. Elect.*

9    *Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*.  Conclusory, non specific statements in

10   affidavits are not sufficient, and "missing facts" will not be "presumed."  *Lujan v. National Wildlife*

11   *Federation*, 497 U.S. 871, 888-89 (1990).

12                                    DISCUSSION

13       In her complaint, plaintiff alleges that defendant discriminated against her because of her

14   gender/sex by subjecting her to a sexually hostile and abusive work environment that interfered with and

15   restricted her ability to perform her work.  Dkt. 1.  The claim is brought under the Washington Law

16   Against Discrimination (WLAD), RCW 49.60.

17       It is an unfair practice for any employer ... [t]o discriminate against any person in compensation or

18   in other terms or conditions of employment because of age, sex, marital status, sexual orientation, race,

19   creed, color, national origin, honorably discharged veteran or military status, or the presence of any

20   sensory, mental, or physical disability....The provisions of chapter 49.60 RCW "shall be construed

21   liberally for the accomplishment of the purposes thereof." RCW 49.60.020.

22       Under the WLAD, Washington courts recognize two types of sex discrimination claims: (1) the

23   *quid pro quo* sexual harassment claim and (2) the hostile work environment claim. *Antonius v. King*

24   *County*, 153 Wn.2d 256, 261 (2004). In this case, plaintiff alleges that she was subject to a hostile work

25   environment, a situation by which the employee seeks to hold the employer responsible for a hostile work

26   environment caused by a supervisor or co-worker's sexual harassment of the employee. *Glasgow v.*

27   *Georgia-Pacific Corp.*, 103 Wn.2d 401, 405 (1985).

28       To establish a hostile work environment sexual harassment case under chapter 49.60 RCW, the

ORDER
Page - 10

1   plaintiff must prove: (1) the harassment was unwelcome; (2) the harassment was because of sex; (3) the

2   harassment affected the terms or conditions of employment, and (4) the harassment is imputed to the

3   employer." *Estevez v. Faculty Club of Univ. of Wash.*, 129 Wn.App. 774, 794 (2005) (quoting *Coville v.*

4   *Cobarc Servs., Inc.*, 73 Wn.App. 433, 438 (1994)).

5           Because chapter 49.60 RCW substantially parallels Title VII, federal cases interpreting Title VII

6   are persuasive authority for the construction of RCW 49.60. *Estevez v. Faculty Club of Univ. of Wash.*, at

7   793 (quoting *Oliver v. Pac. NW Bell Tel. Co.*, 106 Wn.2d 675, 678 (1986)). However, the scope of Title

8   VII is not as broad as RCW 49.60, as Title VII does not contain a direction for liberal interpretation as

9   WLAD does. *Martini v. Boeing Co.*, 137 Wn.2d 357, 372-73 (1999).

10          **1.  Unwelcome**

11          Plaintiff alleges that Mr. Pratt's conduct was unwelcome.  Defendant does not dispute that the

12   conduct was unwelcome.

13          **2.  Harassment Because of Sex**

14          Plaintiff alleges that Mr. Pratt followed her, particularly in connection with her going to the

15   bathroom, and got up close behind her and breathed down her back. Plaintiff also contends that Mr.

16   Pratt's behavior was directed at other women, but particularly, to her. She perceived his behavior as

17   stalking.  Defendant maintains that Mr. Pratt was socially awkward around men as well as women, and

18   that his behavior was directed to both men and women.  The record shows that several women indicated

19   that Mr. Pratt got up close behind them, breathed on their necks, and went close to the bathroom when the

20   women were inside.  There is at least an issue of fact regarding whether the alleged harassment was

21   because of sex.

22          **3.  Affected Terms or Conditions of Employment**

23          Plaintiff contends that she directed her actions at work to avoid coming in contact with Mr. Pratt.

24   Other women indicated that they also attempted to alter their activities avoid Mr. Pratt. When she learned

25   from Ms. Sauls, on March 5, 2008, that Mr. Pratt appeared to put his head near the door, as if to listen if

26   someone was in the bathroom, then opened the bathroom door and leaned into the entrance way of

27   women's restroom, plaintiff complained.  On March 6, 2008, Mr. Pratt was instructed not to clean the

28   women's bathroom that night, and to avoid all contact with plaintiff or Ms. Sauls. On March 8, 2008,

1 | after plaintiff encountered Mr. Pratt when she came out of the locker room, she complained.  Mr. Pratt

2 | was suspended during the investigation.  After the investigation was finished, Mr. Pratt was permitted to

3 | return to work, under detailed conditions.  Plaintiff has not identified any incidents involving Mr. Pratt

4 | after he returned to work. He retired from the company in 2008.

5 |       To meet the third hostile work environment element, the employee must establish that the

6 | harassment was sufficiently pervasive so as to alter the conditions of employment and create an abusive

7 | working environment. *Glasgow v. Georgia-Pacific Corp.*, 103 Wn.2d 401, 406 (1985). Courts consider

8 | the "frequency of the discriminatory conduct; its severity; whether it is physically threatening and

9 | humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's

10 | work performance". *Sangster*, 99 Wn.App. 156, 163 (406) (quoting *Harris v. Forklift Sys. Inc.*, 510 U.S.

11 | 17, 23, (1993)). The required showing of severity or seriousness of the harassing conduct varies inversely

12 | with the pervasiveness or frequency of the conduct. *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991).

13 | Casual, isolated or trivial manifestations of a discriminatory environment do not affect the terms and

14 | conditions of employment to a sufficiently significant degree to violate the law. *Glasgow*, 103 Wn.2d at

15 | 406. Although a single act can be enough, generally, repeated incidents create a stronger claim of hostile

16 | environment, with the strength of the claim depending on the number of incidents and the intensity of

17 | each incident. *King v. Bd. of Regents of Univ. of Wisconsin Sys.*, 898 F.2d 533, 537 (7th Cir.1990).

18 | Whether the harassment creates an abusive working environment is determined by examining the totality

19 | of the circumstances. *Sangster*, 99 Wn.App. at 163. And "[s]ummary judgment in favor of the employer

20 | in a discrimination case is often inappropriate because the evidence will generally contain reasonable but

21 | competing inferences of both discrimination and nondiscrimination that must be resolved by a jury."

22 | *Davis v. West One Auto. Group,* 140 Wn.App. 449, 45 (2007), review denied, 163 Wn.2d 1040 (2008).

23 |       In this case, there are multiple issues of fact as to the pervasiveness of Mr. Pratt's conduct and the

24 | seriousness of that conduct, particularly before the March 5, 2008 incident.  Plaintiff and her co-workers

25 | contended that they talked with their resource individuals about Mr. Pratt's conduct, and that his behavior

26 | was common knowledge.  Mr. Paradee stated that he had become of concerns at Mr. Pratt's conduct for

27 | two years before the March 5, 2008 incident. Plaintiff has met her burden to show that there are issues of

28 | fact regarding the pervasiveness of the conduct and the extent to which his behavior altered the conditions

1  or terms of her employment.

2      **4. Imputed to Employer**

3      Plaintiff contends that it was common knowledge at the company that Mr. Pratt was engaging in

4  harassing behaviors toward women–especially her–and that she talked to her resources several times over

5  the past few years. Plaintiff stated that she once went to HR about the issue, before the March 5, 2008

6  incident, but there are no details about what transpired during that contact.  Plaintiff complained to HR

7  the day after the March 5, 2008 incident.  Mr. Paradee told Mr. Britt that concerns about Mr. Pratt had

8  been expressed within the "last couple years".

9      An employer will not be held liable for a discriminatory environment created by a plaintiff's

10  co-worker or supervisor unless the plaintiff can show that (1) the employer authorized, knew, or should

11  have known of the harassment and (2) failed to take reasonably prompt and adequate corrective action.

12  *Washington v. Boeing Co.*, 105 Wn.App. 1, 11 (2000). The knowledge element can be met by proof that

13  complaints were made to the employer through higher managerial or supervisory personnel or by proving

14  such a pervasiveness of sexual harassment at the workplace as to create an inference of constructive

15  knowledge.  *Glasgow v. Georgia-Pacific Corp*, 103 Wn.2d at 407. Once an employer knows of the

16  harassment, it is only required to take "reasonably prompt and adequate corrective action." *Herried v.*

17  *Pierce County Pub. Transp. Benefit Auth*. Corp., 90 Wn.App. 468, 474 (1998). Employers need not take

18  all possible,  measures of corrective action. *Estevez v. Faculty Club of the Univ. of Washington*, 129

19  Wn.App. at 796.

20      The corrective action taken by the employer should be reasonably calculated to end the

21  harassment. *Ellison v. Brady*, 924 F.2d  872, 882 (9th Cir. 1991). Remedies should be assessed

22  proportionately to the seriousness of the offense. *Dornhecker v. Malibu Grand Prix Corp*., 828 F.2d 307,

23  309 (5th Cir.1987). Employers should impose sufficient penalties to assure a workplace free from sexual

24  harassment. *Ellison v. Brady*, 924 F.2d at 882.  The reasonableness of an employer's remedy will depend

25  on its ability to stop harassment by the person who engaged in harassment.  *Id.*  In evaluating the

26  adequacy of the remedy, the court may also take into account the remedy's ability to persuade potential

27  harassers to refrain from unlawful conduct. *Ellison v. Brady*, 924 F.2d at 882..

28      In this case, there are issues of fact as to whether supervisors were aware of Mr. Pratt's conduct,

ORDER
Page - 13

1   when they became aware of the conduct, and how pervasive that conduct was.  Plaintiff has met her

2   burden to establish that there are issues of fact as to whether knew or should have known of Mr. Pratt's

3   allegedly unwelcome conduct; and whether defendant failed to take reasonably prompt and adequate

4   corrective action.

5      **5.  Conclusion**

6         Plaintiff has met her burden to show that there are issues of fact as to whether she was

7   discriminated against on the basis of sex by a hostile work environment.  Defendant's motion for

8   summary judgment should be denied.

9         Therefore, it is hereby

10        **ORDERED** that Defendant's Motion for Summary Judgment and Memorandum in Support (Dkt.

11  22) is **DENIED**.

12        The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any

13  party appearing *pro se* at said party's last known address.

14        DATED this 9th day of June, 2010.

15
16                                              _____
                                                Robert J. Bryan
17                                              United States District Judge

18

19

20

21

22

23

24

25

26

27

28